## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 4:23-cr-142 |
| v. | ) | |
| | ) | UNITED STATES' |
| CARL DALE MARKLEY, | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

For over twenty years, Defendant Carl Dale Markley used fraud and coercion, trickery and deceit to cause dozens of teenage boys and young men, and a few young women, to let him fondle their genitals, masturbate them to ejaculation, penetrate their anuses with his fingers, and/or perform oral sex on them. Defendant devoted hundreds of hours to preying on, grooming, and sexually abusing his victims and covering up his crimes. It's estimated Defendant targeted at least 200 individuals.

To gain the trust of his victims and the parents of child victims, Defendant abused his position as a wealthy, well-connected Ames-area business owner, nurse practitioner, apartment owner, and adjunct professor. Defendant's businesses hired primarily teenagers and college-aged individuals, and he geared his medical practice towards children, even volunteering to provide medical services to youth at numerous local schools, organizations, and clinics. Defendant employed many of his victims; he served as their primary medical provider; he was their landlord; he was their

professor; he even went into business with several victims. Many victims looked up to Defendant, viewing him as a mentor, role model, and close friend.

Defendant then exploited the faith his victims placed in him. Defendant lied to his victims and the parents of child victims that he needed access to his victims' bodies because:

- He was performing "research" on behalf of institutions and companies, like the Kinsey Institute, William Penn University, Durex, Lifestyles, and Trojan;

- He was engaged in "research" as part of his educational pursuits;

- He was receiving monetary grants to perform said "research," and other researchers and subjects were part of his "research" projects;

- He needed to perform "massages" to obtain various certifications; and

- His insurance company required his employees to undergo "physicals," which involved Defendant touching their genitals.

None of these claims were true. Defendant was not engaged in "research"; there was no "physical" requirement. Defendant wanted to touch teenage boys and young men for one purpose: to satisfy his depraved sexual desires.

And he was willing to pay to do that. In exchange for victims' participation in purported "research" or so-called "physicals," Defendant paid his victims tens of thousands of dollars, lying to them that the money came from third parties funding his activities; he loaned victims money and pressured them to complete "research" sessions to pay down their debts; he bought them gift cards, offered them rent reductions, and gave them job references and employment opportunities.

Defendant groomed his victims, introducing his victims to sexually charged comments and supposed "physicals" before attempting to engage in more invasive sex

acts. Defendant told his victims that his so-called "research" was helping people, that he would do anything to help his victims. Multiple victims thought so highly of Defendant that they recommended that their relatives or friends participate in Defendant's "research," which resulted in Defendant abusing even more people.

It wasn't enough for Defendant to engage in sex acts with his victims. Sometimes, he placed hidden cameras in his exam room or other locations where he performed sex acts on victims. Defendant captured videos and images of child- and adult-victims' genitals. Videos show Defendant fondling and masturbating victims' genitals to the point they ejaculate into Defendant's hand.

Defendant also searched for and viewed child pornography. He visited websites with titles like, "Cute boy gets his mouth used and abused," "Mature school principal seduces young boy," and "Helpless teen gets exploited by a church leader." Defendant's electronic devices contained materials depicting children who appeared to be less than twelve years of age and children being penetrated by adult males.

Defendant did all he could to keep his crimes going. He researched and drafted fraudulent "consent" forms he had victims sign. He created fake names and email accounts to communicate with victims. When an employee reported Defendant to the Iowa Board of Nursing for performing "physicals" on male children without parental consent, Defendant persuaded the agency he had done nothing wrong.

After investigators executed search warrants at Defendant's residence and exam room, Defendant tried to conceal his wrongdoing. He created a fake sexual health company, made a website for the company, and even distributed fraudulent

stock certificates to several victims, telling them that their interests in the company reflected their participation in his past "research." He defamed a well-respected woman stating on his website that she had "facilitated" his past "research." And he asked victims to have his back if investigators spoke with them.

Despite pleading guilty to *fifteen* federal crimes, Defendant continues to tell others he has done nothing wrong. He told one relative that he wants to write a "short book" about how "they strong arm you into pleading guilty into things that you're not guilty of." He maintains that he was simply trying "to do the right thing."

Sentencing is set for Monday, March 24, 2025, at 9:15 a.m. This Court should sentence Defendant to life in prison.

## **TABLE OF CONTENTS**

Introduction...................................................................................................... 1

I.      Procedural Background ........................................................................ 5

II.     Defendant's Objections to the Final PSR's Factual Allegations
        Concerning His Misconduct Should Be Denied .................................. 7

III.    Defendant Is Not Entitled to a Reduction for Acceptance of Responsibility.... 7

IV.     Count 16 Should Not Be Scored for Purposes of Calculating the
        Applicable Advisory Guidelines Range .............................................. 13

V.      Victims Seeking Restitution Should Be Awarded the Requested Amounts... 14

VI.     Defendant Should Be Sentenced to Life in Prison ............................. 15

VII.    Conclusion .......................................................................................... 30

# I.     PROCEDURAL BACKGROUND

On November 15, 2023, a grand jury returned a seventeen-count Indictment against Defendant. (ECF 2). The Indictment alleged that Defendant had, over the course of two decades, engaged in sex trafficking and child-pornography offenses involving at least fifteen victims. The charges were as follows:

- Counts 1 to 15, Sex Trafficking by Fraud and Coercion, in violation of 18 U.S.C. § 1591(a)(1), (b)(1) and 1594(a);

- Count 16, Sexual Exploitation and Attempted Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a) and (e); and

- Count 17, Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).

(*Id.*). Ultimately, trial was set to begin on December 6, 2024, with a final plea-entry deadline of August 28, 2024. (ECF 28, 32, 33).

On November 26, 2024, months after the plea-entry deadline and only ten days before trial, Defendant pleaded guilty pursuant to a written Plea Agreement to Counts 1 through 15 of the Indictment. He also agreed to pay restitution to all victims of his relevant conduct. (ECF 40; ECF 41, at 1, 7-8) In exchange, the government agreed to dismiss the remaining two counts at sentencing. (ECF 41, at 2-3).

A draft presentence investigation report (PSR) was filed on January 24, 2025. (ECF 47). Both parties filed objections to the draft PSR. (ECF 48, 53). A final PSR was filed on March 14, 2025. (ECF 54, hereinafter the "Final PSR"). The Final PSR calculates Defendant's advisory guidelines range as follows:

**Group for Count 2**

| | |
|---|---|
| Base (§2G1.3(a)(1)) | 34 |
| Relative or Guardian of Minor (§2G1.3(b)(1)(A)) | +2 |
| Commission of a Sex Act/Sexual Contact (§2G1.3(b)(4)(A)(i)) | +2 |
| Abuse of a Position of Trust/Special Skill (§3B1.3) | +2 |
| Obstruction of Justice (§3C1.1) | +2 |
| Adjusted Offense Level | 42 |

**Separate Groups for Counts 1, 4 through 12, 14, and 15**

| | |
|---|---|
| Base (§2G1.1(a)(1)) | 34 |
| Abuse of a Position of Trust/Special Skill (§3B1.3) | +2 |
| Obstruction of Justice (§3C1.1) | +2 |
| Adjusted Offense Level | 38 |

**Group for Counts 3 and 13 (both involving Victim #3)**

| | |
|---|---|
| Base (§2G1.1(a)(1)) | 34 |
| Abuse of a Position of Trust/Special Skill (§3B1.3) | +2 |
| Obstruction of Justice (§3C1.1) | +2 |
| Adjusted Offense Level | 38 |

**Group for Count 16 (involving Minor Victim #1)**

| | |
|---|---|
| Base (§2G2.1(a)(1)) | 32 |
| Minor Less than 16 Years (§2G2.1(b)(1)(B)) | +2 |
| Commission of a Sex Act/Sexual Contact (§2G2.1(b)(2)(A)) | +2 |
| Abuse of a Position of Trust/Special Skill (§3B1.3) | +2 |
| Use of a Minor (§3B1.4) | +2 |
| Adjusted Offense Level | 40 |

| | |
|---|---|
| Most Severe Group (Group for Count 2) | 42 |
| Grouping (§§3D1.3, 3D1.4) | +5 (for 15 units) |
| Pattern (§4B1.5(b)) | +5 |
| **Total Offense Level** | **52 (a 43)** |
| **Criminal History** | **I** |
| **Advisory Guidelines Range** | **Life** |

(Final PSR 83-87, 96, ¶¶ 356-93, 397, 460-61).

At the sentencing hearing, this Court will need to resolve Defendant's numerous factual objections to the Final PSR, as well as a couple of disputed

6

guidelines issues. In addition, this Court will need to award restitution and determine Defendant's ultimate sentence.

## II.   DEFENDANT'S OBJECTIONS TO THE FINAL PSR'S FACTUAL ALLEGATIONS CONCERNING HIS MISCONDUCT SHOULD BE DENIED

Defendant submitted over one hundred objections to the draft PSR, many of which are frivolous and concern the report's factual allegations. Although the objections have no effect on the applicable advisory guidelines range, many objections go to the heart of Defendant's criminal activity, background, and character, and the government addresses these objections to clarify the record for purposes of this Court considering the information pursuant to 18 U.S.C. §§ 3553(a) and 3661. The government's responses to Defendant's objections are contained in Attachment A. The government also submits over one hundred exhibits, all of which are identified in the exhibit list to be filed herewith. Based on the government's evidence, Defendant's Plea Agreement, and the unobjected-to portions of the Final PSR, Defendant's objections should be overruled.

## III.  DEFENDANT IS NOT ENTITLED TO A REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY

Defendant should not be awarded a reduction for acceptance of responsibility under USSG §3E1.1(a). That guideline allows for a two-level reduction where a defendant proves by a preponderance of the evidence that he has "clearly demonstrate[d] acceptance of responsibility for his offense." *United States v. Reyna Rodriguez*, 810 F. App'x 470, 474 (8th Cir. 2020) (per curiam) (unpublished). Although a guilty plea is typically "significant evidence" in favor of the reduction, a defendant

7

who pleads guilty "is not entitled to an adjustment" for acceptance of responsibility "as a matter of right." USSG §3E1.1, comment. (n.3). A guilty plea, instead, "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id*. Relevant considerations include whether the defendant "falsely denies, or frivolously contests, relevant conduct" and "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." USSG §3E1.1, comment. (n.1).

Furthermore, "[a] defendant is not entitled to the [§3E1.1] reduction if he minimizes or lies about his criminal conduct." *United States v. Bailey*, 493 F. App'x 785, 786 (7th Cir. 2012) (unpublished order). The Eighth Circuit has repeatedly reiterated that the reduction should be not awarded when defendants criticize the investigation, blame others, or maintain their innocence. *See, e.g.*, *United States v. Speck*, 992 F.2d 860, 863 (8th Cir. 1993) (reversing district court's grant of the reduction where defendant continued to "maintain[] his innocence and . . . blame others for his prosecution and conviction"); *United States v. Ransom*, 990 F.2d 1011, 1013 (8th Cir. 1993) (affirming denial of reduction where "defendant referred to the government's prosecution as 'a witch hunt' and added that he 'was forced into a position in which [he] had no choice but to go this long'"); *United States v. Laird*, 948 F.2d 444, 446-47 (8th Cir. 1991) (same, where defendant claimed "he was not responsible"); *United States v. Cree*, 915 F.2d 352, 355 (8th Cir. 1990) (same, where defendant "admitted only that his behavior was a 'mistake'"); *United States v. Dugan*, 912 F.2d 942, 944 (8th Cir. 1990) (same, where defendant blamed her actions on "the domination of her husband").

Where a defendant's conduct merits the obstruction-of-justice enhancement, moreover, only in "extraordinary cases" should he also be awarded a reduction for acceptance of responsibility. USSG §3E1.1, comment. (n.4); *accord United States v. McHenry*, 849 F.3d 699, 707-08 (8th Cir. 2017). Such cases are "extremely rare and highly exceptional" and will generally occur where the obstruction was an isolated incident, where the defendant voluntarily terminated his obstruction, or where the defendant admitted and recanted the obstruction. *United States v. Sandoval*, 74 F.4th 918, 923 (8th Cir. 2023) ("Merely pleading guilty does not entitle a defendant [who has obstructed justice] to this reduction.").

Here, if anything, Defendant's case is extraordinary "because of the magnitude of his obstruction" and his repeated express denials of acceptance, "not [for] his penitence." *Id.*

Start with Defendant's obstruction of justice. After Defendant learned he was under investigation, he "made numerous attempts" to conceal his wrongdoing, "convince victims he [had done] nothing wrong," and "give others the appearance his earlier conduct was legitimate." (Final PSR 72, ¶ 297 (unobjected-to)). Take just the following examples. Defendant:

- Created a fictitious company ("21st Century Male") and a website for that company where he (a) lied about his conduct, (b) said that a "group" of people owned and operated the company, and (c) claimed that an innocent woman had "facilitated" his fake research for over a decade;

- Drafted fraudulent stock certificates for his fake company which he then distributed to victims, thereby giving victims the impression that their earlier meetings with Defendant had been for legitimate research;

- Sent victims images of sex-related products he had ordered from Amazon and told victims that they were "prototypes" or items his fake company would sell;

- Lied to victims about the nature of the criminal investigation pending against him, asked victims for ideas and help with his fake company, and continued telling victims lies about the nonexistent "research" he was conducting;

- Had victims sign "backdated fraudulent consent forms"; and

- Offered a minor victim free games of duckpin bowling and offered to pay for another victim to attend appliance-repair school.

(Final PSR 72-79, ¶¶ 297-344; Gov. Sent. Ex. 0; Gov. Sent. Ex. 16, at 57-58; Gov. Sent. Ex. 17, at 24-25, 31-35; Gov. Sent. Ex. 18, at 38-40; Gov. Sent. Ex. 21, at 42-48; Gov. Sent. Ex. 22, at 37-40; Gov. Sent. Ex. 68; Gov. Sent. Ex. 69).

All of Defendant's efforts were designed to "tr[y] to get the[] [victims] on his side." (Final PSR 77, ¶ 323). He explicitly asked one victim that if the "cops had any questions for him," whether the victim would "have his back." (Final PSR 77, ¶ 329; Gov. Sent. Ex. 16, at 57). When Defendant gave another victim a fraudulent stock certificate, he asked the victim whether the victim "trust[ed] him" and was "trying to make sure that [the victim] was going to defend him." (Gov. Sent. Ex. 50, at 37).

On top of all that, even after search warrants were executed at his house and medical practice, Defendant continued abusing and attempting to abuse victims. (Final PSR 76, ¶334). Defendant offered to perform a fraudulent "physical" on a child victim and to pay the child in exchange. (Final PSR 78, ¶335). He met with another victim at an apartment unit in Ames where he lied to the victim that he was performing a "sensitivity" study, fondled and stimulated the victim's genitals, and paid the victim for his participation. (Final PSR 77, ¶¶ 337-38; Gov. Sent. Ex. 19, at 20-24). Defendant then offered the victim "an ownership stake" in the fictitious company he had created and had the victim sign a fraudulent consent form which

included a "Confidentiality" provision to ensure the victim would not disclose the abuse. (Final PSR 77, ¶¶ 337-38; Gov. Sent. Ex. 19, at 20-24). And Defendant continued accessing and viewing child pornography. (Final PSR 13, ¶ 63; *see* Gov. Sent. Ex. 64, at 2-3).

The foregoing misconduct was not an "isolated incident." Defendant did not voluntarily end his obstructive behavior; it ended only when the government exhausted countless resources to put it to an end. For that matter, the website for Defendant's fake company remained live and publicly accessible until at least January 21, 2025. (Final PSR 73, ¶ 301). And Defendant has neither admitted nor recanted his obstruction—in his objections to the draft PSR, he frivolously maintains that many of his acts were not wrongful. (*See generally* ECF 53).

Defendant proceeded to blow past his plea-entry deadline, pleading guilty only days before trial. By that time, the government had expended extensive resources in preparation for trial, including filing pretrial submissions and prepping victims who had to relive the harm Defendant inflicted on them.

Defendant now has filed numerous frivolous objections to the draft PSR, including objections which are wholly inconsistent with the admissions Defendant made in his Plea Agreement. (*Compare* ECF 53, *with* ECF 41, at 15-21). Despite admitting in the Plea Agreement, for instance, that he never conducted sex-related research for a third party, that he used hidden cameras to capture images of teenage boys and young men, and that he used fraud and coercion for twenty years to convince victims to let him perform sex acts on them, Defendant now claims exactly the opposite. (*See* ECF 41, at 15-21). He says he "accidentally" recorded his victims with

11

hidden, undisclosed cameras; he tells the probation office that he intends to "develop a sexual education program, specifically for men." (Final PSR 82, ¶ 354). None of this behavior indicates Defendant has accepted responsibility. *See, e.g.*, *United States v. Zeaiter*, 891 F.3d 1114, 1123-24 (8th Cir. 2018) (affirming denial of §3E1.1 reduction based on defendant's false and frivolous objections to presentence report).

Defendant's repeated lies to others about investigators, his conduct, and his guilt leave no doubt that he has not accepted responsibility. *See, e.g.*, *United States v. Graham*, 630 F. App'x 712, 715 (9th Cir. 2015) (unpublished memorandum) (affirming denial of §3E1.1 reduction where defendant confessed to murder but then "told friends she had been exonerated by multiple polygraph tests"); *United States v. Miller*, 343 F.3d 888, 890-91 (7th Cir. 2003) (same where Defendant was minimizing his crimes "trying to save face with his family"). Defendant continues to blame everyone but himself for his crimes. For example, in a recorded jail call from December 2, 2024:

- Defendant commented to a relative that investigators "turned it into something it wasn't, and knowingly did so, so that they could justify their search warrant." Defendant said, "anybody who looks at it [his conduct] knows that . . . I have goals in mind, and they ignored all that."

- Defendant's relative agreed, stating that investigators "were seeking not necessarily justice or truth, but they were seeking conviction," and that investigators "twisted and distorted things out of perspective." Defendant concurred, "Yeah, it's crazy."

- Defendant said that he "need[ed] to write a short book, how they strong arm you into pleading guilty into things that you're not guilty of because they clump'em all together and make you look like trash."

- When another relative said it was "hard for me to see you going to prison for something you weren't doing," Defendant agreed, saying "Right. Exactly." "For trying to do the right thing and getting people's consent."

(Gov. Sent. Ex. 67, at 9:35-12:00, 13:10-20:07; *see, e.g.*, Final PSR 79-80, ¶¶ 345-51; Gov. Sent. Ex. 66).

Defendant's own words establish that he has not accepted responsibility; he has failed to "grasp[] the severity of his conduct," and he has proven incapable of "express[ing] remorse." (Final PSR 82, ¶ 354). He " has regularly claimed to others that he is guilty of nothing." (Final PSR 79-80, ¶ 345). *see, e.g.*, *United States v. Cook*, 922 F.2d 1026, 1037 (2d Cir. 1991) (affirming denial of §3E1.1 reduction where defendant maintained post-plea that he had done "nothing wrong"); *United States v. Talisov*, 339 F. App'x 920, 926-27 (11th Cir. 2009) (per curiam) (unpublished) (upholding denial of §3E1.1 reduction based, in part, on defendant's pre-plea statements to a psychologist that "he did nothing wrong"). Defendant should not be awarded a reduction under USSG §3E1.1.[1]

## IV. COUNT 16 SHOULD NOT BE SCORED FOR PURPOSES OF CALCULATING THE APPLICABLE ADVISORY GUIDELINES RANGE

Both the government and Defendant object to the Final PSR's scoring of Defendant's conduct underlying Count 16—production of child pornography involving Minor Victim #1. The government asks that the conduct be scored pursuant to the applicable sex-trafficking guideline (USSG §2G1.3), while Defendant argues the conduct should not be scored at all. (*See* ECF 54, at 199-201 (referencing both parties' objections)).

---

[1] In the end, with or without the §3E1.1 reduction, Defendant's advisory guidelines range will remain the same—life in prison.

Technically, the conduct should be scored. The sex-trafficking guidelines, USSG §§2G1.1 and 2G1.3, both provide that when a defendant's relevant conduct involves "more than one victim, whether specifically cited in the count of conviction [or not], each such victim shall be treated as if contained in a separate count of conviction." USSG §2G1.1(d)(1), comment. (n.5); §2G1.3(d)(1), comment. (n.6). In this case, the creation of such "pseudo groups" would result in dozens of groups being scored for each of the numerous adults and minors, including Minor Victim #1, who are not mentioned in the Indictment's sex-trafficking counts and whom Defendant defrauded and coerced (or attempted to defraud and coerce) into engaging in commercial sex acts for his own sexual pleasure from at least 2001 to April 2023. But the formation of those pseudo groups would have no impact on the applicable advisory guidelines range—based on only the conduct underlying the fifteen counts to which Defendant pleaded guilty, the guidelines recommend Defendant be sentenced to life in prison.

Accordingly, for the sake of the record and to avoid the need for a purely academic exercise at the sentencing hearing, the government agrees with Defendant that Defendant's conduct underlying Count 16 should not be scored as part of calculating the applicable advisory guidelines range.

## V.     VICTIMS SEEKING RESTITUTION SHOULD BE AWARDED THE REQUESTED AMOUNTS

In his Plea Agreement, Defendant agreed to pay restitution in an amount to be determined by this Court for all victims "for all relevant conduct." (ECF 41, at 7-8). To date, two victims have submitted restitution requests. (Gov. Sent. Ex. 102A, 107A,

107B). One victim has requested over $600 for losses incurred to attend counseling sessions, and a second victim has asked for restitution due to lost wages he suffered due to his participation in this case on two dates in fall 2023. At sentencing, the government expects to know the exact amounts requested by these two victims, and this Court should award restitution to the two victims in those amounts.

## VI.    DEFENDANT SHOULD BE SENTENCED TO LIFE IN PRISON

There is only one sentence sufficient, but not greater than necessary, to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a)—Defendant should be sentenced to life in prison. For over twenty years, Defendant preyed on teenage boys and young men, defrauding and pressuring them into letting him perform sex acts on them. He knew what he was doing was wrong, and he kept at it anyways. He dedicated countless resources to accomplish and conceal his crimes, and to this day, he claims he did nothing wrong, leaving scores of victims behind to pick up the pieces.

### A.    Defendant devoted his entire adult life to grooming and sexually abusing teenage boys and young men, victims who trusted him and now must live with the shame and trauma of his acts.

The scope of Defendant's crimes, and the harm they have wrought, calls for a life sentence. Defendant's crimes started over twenty years ago, in about 2001, when he used fraud and coercion to convince a roughly thirteen-year-old child in his care, custody, and control that he needed to fondle the child's genitals as part of a college project for William Penn University. (Final PSR 20, 68-69, ¶¶ 96, 279-82).

From that time until spring 2023, Defendant's life was designed to give him access to teenage boys and young men. He became a nurse focused on pediatrics and

volunteered to provide medical care and free physicals to children at numerous schools, organizations, and clinics, including facilities caring for troubled youth. He owned and operated businesses that offered bowling, ice cream, golf simulators, and other activities of interest to children and that hired primarily teenage boys and young men. He became an adjunct professor at Grand View University, where he taught aspiring nursing students. He helped create a "mini empire" of apartment units in Ames that rented to young people. (Final PSR 8-11, 49, ¶¶ 16-43, 197).

Defendant used and abused his professions and position in the community to identify and target victims. Defendant's victims were his patients, employees, students, and tenants; they were children who visited his businesses; they were kids he met when they resided at facilities for troubled youth where he worked or volunteered. Defendant provided mental-health services and medication to some victims. He even offered to be business partners with victims or to pay for their education. (Final PSR 10-11, 17-18, ¶¶ 36, 44-45, 73, 79-81; *see, e.g.*, Gov. Sent. Ex. 50, at 16-17).

Many victims thought the world of Defendant. (*See, e.g.*, Final PSR 49-50, ¶¶ 196-199). Defendant bragged to victims about his relationships with important people and local celebrities. He told them about his wealth and business ventures. He claimed he was in the medical profession not for financial reasons, but to help others. (Final PSR 17-18, ¶¶ 79-81, 84).

Victims fell for Defendant's façade. They viewed him as a trusted friend, a person with whom they could share their most intimate details. (Final PSR 18-19, ¶¶ 81, 86-87). They wanted to maintain a good relationship with Defendant because

they believed he would help them in the future. (*Id.*). Consider the words victims use to describe their relationships with Defendant:

- "I trusted [Defendant] enough to make major life decisions around him, and to trust him like no other. [Defendant] became an individual who I trusted, truthfully more than anyone else." "I trusted him with things that I told no one else—both medically and personally related." (Gov. Sent. Ex. 108).

- "I truly believed that [Defendant's] success as an entrepreneur, influence in the Ames community, and personal connections would set me on a successful path . . . ." (Gov. Sent. Ex. 105).

- "I did so much to help [Defendant] because I looked up to him and because I thought it would help my future career." (Gov. Sent. Ex. 101).

But the only person Defendant was helping was himself. Over the course of more than twenty years—Defendant's entire adult life—he targeted over 200 individuals, and he sexually abused scores of teenage boys, young men, and a few young women, corrupting the faith those individuals had in him for his own sexual appetite. (*See, e.g.*, Final PSR 6-7, ¶¶ 10-12).

The harm, shame, and trauma those individuals and their parents now must confront will last a lifetime. Victims struggle to trust others—some find it difficult to visit medical providers out of fear that they will be manipulated or secretly recorded. Other victims and parents carry tremendous guilt for introducing their children, relatives, and/or friends to Defendant, people Defendant went on to abuse. Just read how victims explain the burdens they now bear.

- "This experience has caused so much trauma. I refuse to go to the doctor unless it is absolutely necessary. I don't know who to trust." (Gov. Sent. Ex. 103).

- "[B]ecause I thought he was genuinely helping me, I shared those opportunities with my friends. Some of them continued working for him, and because *I* introduced them, they were affected to. I was just trying to help my friends,

but instead, I unknowingly led them into harm's way. I'll always be aware of that, and them too." (Gov. Sent. Ex. 109).

-   "His damage to me won't ever be fully gone. His ability to manipulate, control, and hurt others is endless. I'll never feel completely safe, and I don't know how to trust again." (Gov. Sent. Ex. 107).

The sentencing guidelines, which already recommend a life sentence, fail to account fully for the foregoing. They don't reflect the number of victims, or the repeated acts and attempted acts of sexual abuse Defendant perpetrated against those victims. Nor do the guidelines consider the extreme duration of Defendant's conduct, the immense harm victims have suffered and will continue to suffer, or the numerous child victims Defendant exploited. But the guidelines get it right here— Defendant should be sentenced to life in prison.

**B.    Defendant's relentlessness and ability to defraud victims into completing commercial sex acts justifies a life sentence.**

It wasn't easy for Defendant to commit these crimes. Defendant's victims and the parents of child victims were largely successful and intelligent. Many graduated from area colleges and universities, and most are gainfully employed as medical providers, first responders, teachers, coaches, and in other occupations.

To overcome his victims' reluctance and manipulate victims into letting him fondle their genitals, masturbate them, digitally penetrate their anuses, and perform oral sex on them, Defendant lied, he deceived, and he threatened victims.

Defendant's primary method was to lie that he needed to perform "physicals" or "research" on victims. Defendant came up with all types of justifications to complete these tasks, all of which were linked to his medical practice and experience. Among other things:

- To get victims to let him fondle their genitals, Defendant lied that he needed to perform "physicals" mandated by his insurance company for employees, or that he was conducting condom-fit studies or "anthropmetrical" sessions for various third parties.

- To convince victims to let him masturbate them, Defendant claimed that third parties were studying penis "sensitivity," that he was completing "massage" sessions during which the victims had to be naked, or that the various third parties he was working with wanted "semen samples," "orgasm analysis," or "ejaculation analysis."

- He inserted his fingers into victims' anuses by lying to them that he was performing a "prostate check," "prostate massage," or "prostate exam."

- He falsely claimed that he needed to touch or penetrate the victims' bodies as part of education requirements.

Defendant text messaged victims incessantly about the money they could make with Defendant—as one victim said, Defendant was "relentless." (Gov. Sent. Ex. 21, at 31-32). Take the following examples of Defendant lying to victims via text messaging that he was completing "research" for the Kinsey Institute, an entity Defendant called "Richmond," and various condom companies, and that those entities were paying hundreds or thousands of dollars to conduct "research":

- "Study partner needed for Kinsey. Both studying each other in different ways. Full Kinsey (could be BJ worst case) study for a year $600. Only taking first 1." (Final PSR 32-33, ¶ 141).

- "Kinsey has a genital analysis available. Pays $50 but it has everything to do with genitals so don't sign up if you're weird about stuff like that! I'm taking 3 people. Thank[s]." (Final PSR 32, ¶ 140).

- "Starting my last session with Kinsey. Anyone want to help? If not, I'll remove you from the list. Paying up to $2,500." (Final PSR 32-33, ¶ 141).

- "Richmond yearlong study. $1200, only taking 5 max." (Gov. Sent. Ex. 92, at 13).

- "Richmond K Everything annual starting July 1. Pays $1200. I'll take 3." (Gov. Sent. Ex. 92, at 14).

- "Lifestyles anthro as part sexual functioning study. Anyone willing? Pays $100, 4-5 meetings over the summer. First 3 get it." "Good news, those who signed up for lifestyles will actually get $500." (Final PSR 23-24, ¶ 113).

- "Trojan anthro study due today. Pays $25, first 3 get it." "Thanks to everyone who signed up. $50 Texas roadhouse cards ready for pick up." (Final PSR 36-37, ¶ 154).

Defendant drafted each of the foregoing texts to make them appear as if he sent them to numerous people, all of whom were interested in completing his "research." But that was just another fraudulent ploy by Defendant. Each of the foregoing texts Defendant sent to one victim and one victim alone. Defendant was simply attempting to give the recipients the false impression that others were participating in legitimate "research."

Defendant engaged in other forms of deceit to cause victims to believe he was working with real third parties on real "research" involving sex acts. During his "research" meetings with victims, he pretended as if he was receiving prompts and instructions from the third parties involved in his research on his phone. Defendant created fake names that he used to communicate and defraud victims; he drafted letters, created email accounts, and sent emails on behalf of those fake people, and all those communications were designed to make victims believe he was conducting research with the supposed third parties. (*See, e.g.*, Final PSR 17, 18-21 ¶¶ 83, 89-107; *see* Attachment A, 3-7, 31-32).

Defendant regularly lied that he was receiving thousands of dollars in "grants" and funding to conduct research for third parties, and that victims who were participating were receiving "bonuses." He misrepresented things like:

- "I got a $25,000 grant for this semester so I have some money making opportunities." (Final PSR 37-39, ¶ 157).

- "If anybody wants to do a year long sexual product development research deal lemme know. I got funding today for 2. Have to be kind of open minded but nothing is crazy. Pays $2k and you can't be in any other study." (*Id.*).

- "I just got a grant, everyone who is helping me is getting a $50 bonus. Thanks." (*Id.*).

- "RA (one of the research companies) is thankful for us and for Thanksgiving is giving everyone a bonus! I'll have cash later today for all of you!" (Final PSR 45, ¶ 187)).

Defendant even drafted dozens of fraudulent consent forms that he had victims sign. For instance, in 2015, Defendant had several victims sign a version of the below form, misrepresenting that he was working in conjunction with legitimate research institutions, M Davis & Company and PEGUS Research:



**INFORMED CONSENT**
**Health-Integumentary**
The survey will also include a few questions about yourself, such as your years of education and ethnic background and some personal practices in an effort to understand how lifestyle choices affect overall health of an individual.

- You are agreeing to participate in an anthropmetrical study.
- It is expected that the time to complete the study within 45 minutes.
- Your name will not be on the survey questionnaire. Your responses will remain anonymous and completely confidential.
- The information collected from you is for research only. Your name will not be used in any reports. This is preliminary at this time, the information may never be used.
- Your participation in the study is voluntary. You may choose not to participate.
- You do not have to answer a question if you do not want to. You may also choose to withdraw from the study at any time.
- (circle) $5 for partial body analysis. $15 for full body analysis. $10 for physical exam prior to participation.

Risk:

- You may feel embarrassed by the sensitive nature of some of the questions, measurements and exam. You may have a reaction to any of the medications, you can refuse a medication at any time.

Benefit:

Helping individuals understand how to better help others with their health.

If you have any questions about your participation in this study, or any concern about this research later, you can contact the study investigator: Carl Markley 515-290████
The data collection company is:
M Davis & Company/Pegus Research
1520 Locust Street, 3rd Floor
Philadelphia, PA 19102
Phone: 215-790-8900

(Gov. Sent. Ex. 40A). Of course, the alleged "data collection compan[ies]," "M Davis & Company/Pegus Research" have confirmed that they had absolutely no relationship to Defendant, that Defendant was never involved with the companies in any way. Even the address listed on the form was not connected to either company at the time Defendant had victims sign versions of this form. (Final PSR 21-22, ¶¶ 100-05).

For that matter, none of the third parties Defendant purported to work for ever engaged Defendant to perform research on their behalf. Defendant never needed to perform sex acts as part of his educational curriculum or for his continuing nursing education. The insurance companies for his businesses did not mandate that his employees undergo a "physical." And investigators reviewed records relating to *eleven* of Defendant's bank accounts—none of the records indicated he was receiving grants, funding, or any payments at all from a research institute or sex-related company or entity. (Final PSR 39, ¶¶ 159-164).

Defendant was telling victims bold faced lies, figments of his imagination. Defendant's creativity, cunning, and success in defrauding victims further support a life sentence.

### C. Defendant controlled various aspects of his victims lives and coerced them to engage in sex acts, and several victims felt they had no choice but to go along with Defendant's "research" and "physicals."

Defendant's repeated abuse of his reputation and positions of trust to pressure victims to engage in commercial sex acts also calls for a life sentence. As an owner of multiple companies and a prominent businessman, Defendant's incessant requests that victims participate in his "research" caused employees to fear reprisal if they did

not oblige. One victim believed that his "success was directly tied to how much I wanted to participate." (Gov. Sent. Ex. 21, at 3). Another victim stated that Defendant had a "stranglehold" on his income and that, when he raised the issue of increased pay with Defendant, Defendant steered the victim toward the completion of paid "research" as a means to make more money. (Gov. Sent. Ex. 20, at 19, 40). When victims asked Defendant to provide verification of the "research" studies, Defendant accused the victims, who also worked for Defendant, of not trusting him. (Gov. Sent. Ex. 20, at 41; Gov. Ex. 21, at 32; Gov. Sent. Ex. 50, at 20-21, 36-37, 40-45). By linking the victims' employment relationship with the Defendant to their willingness to allow Defendant repeated access to their bodies, Defendant coerced victims into engaging in commercial sex acts.

Moreover, because Defendant held several important roles in many of the victims' lives, such as employer, primary medical provider, professor, landlord, and mentor, victims risked losing Defendant's support if they chose not to participate. (Gov. Sent. Ex. 17, at 7-8, 10-11; Gov. Sent. Ex. 20, at 9, 11, 14-17; Gov. Sent. Ex. 21, at 11-17; Gov. Sent. Ex. 22, at 8-11). One victim said that it was "important" Defendant viewed him positively, because Defendant "was a big part of my life, did a lot of things for me." (Gov. Sent. Ex. 50, at 43; Gov. Sent. Ex. 18, at 12-13). Defendant's reputation in the community left another victim feeling like "nobody would believe me" if he reported Defendant's behavior to authorities. (Gov. Sent. Ex. 19, at 26-27).

Defendant exploited victims' need for money as another way of gaining access to their bodies. Defendant routinely offered to pay victims a generous sum up front, sometimes thousands of dollars, based on their agreement to participate in a certain

number of "research" sessions over the course of months or years. (*See, e.g.*, Gov. Sent. Ex. 16, at 26; Gov. Sent. Ex. 17 at 28-29; Gov. Sent. Ex. 20, at 41). The benefits of this arrangement to Defendant were obvious—if paid up front, victims were not free to decide a few sessions in that they no longer wanted to participate and simply stop. Rather, they would have to complete their commitment to Defendant or come up with the money to pay back the advance. Given that most victims were teenagers and young adults, Defendant reasonably expected that his victims would spend the money they received up front, such that it would be more feasible to complete the studies than to find another source of thousands of dollars to pay Defendant back.

When victims told Defendant they no longer wanted to do the "research," Defendant required them to pay back the money, and if victims failed to do so or stopped communicating with Defendant, Defendant threatened to send their debts to collections. (Final PSR 47, ¶ 193). Defendant also delayed paying victims for their participation in "research" sessions until they had completed several sessions, as a means of coercing them to continue allowing him access to their bodies. (*See, e.g.*, Gov. Sent. Ex. 22, at 35).

**D.     Defendant's appetite to sexually abuse teenage boys and young men necessitates a life sentence.**

Defendant is a voracious sexual predator who should be permanently incapacitated. Defendant's imagination knew no bounds in regard to the sex acts he sought to complete with victims. Defendant conned victims into letting him smell their private regions, permitting him to watch victims engage in sex acts with each other, and (for at least one victim) allowing him to perform oral sex on the victim. He

even drafted the below "menu" of tasks that could be completed during a "research" session.

All parts to be completed with both researcher and participant in same room. 19 components need to be completed, $100 bonus if all completed

1. Researcher undresses participant, participant stays undressed
2. Researcher view participant phone contents
3. Researcher view participant wallet contents
4. Researcher smell participant body
5. Participant goes through favorite porn review
6. Researcher tests participant for STI's
7. Both parties tongue kiss for 10 minutes
8. Researcher performs genital exam on participant
9. Researcher performs genital exam in lithotomy position on participant
10. Researcher performs rectal exam on participant
11. Participant obtains erection
12. Researcher performs massage therapy on participant
13. Participant tries different condoms on
14. Researcher performs 10 minutes of masturbation on participant
15. Researcher performs 10 minutes of fellatio on participant
16. Participant masturbates to ejaculation
17. Participant defecates
18. Participant urinates
19. Participant bathes for minimum of 5 minutes
20. Participant tells of 5 embarrassing stories
21. Participant tells researcher about lies from the past they have committed

(Gov. Sent. Ex. 84).

On top of performing sex acts on victims, Defendant used hidden cameras to capture his victims (including multiple minor children) naked and engaged in those acts. Defendant's electronic devices contained hidden-camera files depicting 25 to 30 victims. Several of those files show Defendant setting up the cameras before touching victims' genitals or masturbating the victims. (*See* Gov. Sent. Exs. 212, 213, 214, 215,

216). And based on the evidence found on Defendant's devices, investigators know Defendant used his electronic devices to watch and view the hidden-camera materials he captured of victims. (*See, e.g.*, Final PSR 63, ¶ 272).

Defendant even tricked victims to sending him images and videos of their genitals. For example, when one victim asked if Defendant had any studies he could complete remotely, Defendant lied to the victim that there was "one Kinsey file you could update over the phone" which required Defendant to "examine [the victim's] genitals." (Gov. Sent. Ex. 74, at 2). Defendant offered the victim "$900 total over 9 months answering very personal questions and analysis. Pics may do from time to time." (*Id.* at 4). The victim went on to text Defendant depictions of his genitals. Defendant told the victim that he had deleted the files, but investigators later found the files on Defendant's cellphone. (*Id.* at 8, 10; Final PSR 42-43, ¶¶ 176-79).

For over twenty years, Defendant sexually abused teenage boys and young adults, duping them or their parents into letting him fondle their genitals or worse. His electronic devices contained child pornography, web searches for child pornography, and web history indicating Defendant visited websites depicting child pornography. To adequately protect the public, Defendant should be sentenced to life in prison.

### E. Defendant knew better, yet he committed these crimes, obstructed justice, and continues to deny wrongdoing.

What truly sets Defendant apart from other sexual abusers and makes him especially dangerous is his intelligence, his sophistication, and his persistence and refusal to admit that what he did to dozens of victims was wrong.

Defendant holds an associate's degree, two bachelor's degrees, and a master's degree. As part of his education, he took classes about scientific research; as a graduate student, he even engaged in a research study concerning attention deficit and hyperactivity disorder in children. He knows about the strenuous requirements surrounding scientific research on human subjects, the very least of which includes approval and monitoring by an institutional review board. And as a licensed nurse and nurse practitioner, Defendant was a certified mandatory reporter of child and dependent abuse who knows that his actions were criminal. (*See, e.g.*, Final PSR 8-9, ¶¶ 16-27).

When Defendant told victims, over and over again, that he needed to perform a "genital analysis" or obtain a "semen sample" because he was completing research on behalf of the Kinsey Institute, condom companies, a nonexistent "insurance" requirement, or some other real or imaginary third party, he knew full well that he was lying. Defendant understood that he was not conducting "research," that his insurance company did not require employees to undergo "physicals," and that what he was doing was wrong—that's why he took so many steps to obstruct justice and coverup his crimes. (*See* Section III *supra*).

Defendant had numerous opportunities to stop his criminal conduct, yet at every turn, he doubled down and continued abusing teenage boys and young men. Defendant was not deterred when in 2013, a victim publicly called him a "pedophile" after Defendant had "tricked [the victim] into completing a 'research study' which entailed a massage and genital touching." (Final PSR 15, ¶ 71). Defendant did not stop in 2021 when an employee reported him to the Iowa Board of Nursing. (Final

PSR 11, ¶¶ 47-49). Even after investigators executed search warrants at his house, exam room, and apartment unit in March 2023, Defendant would not quit. Defendant went on to defraud and coerce a victim into letting him stimulate the victim to the point of erection for a "sensitivity" study. (Final PSR 77, ¶ 337). Not until he was federally detained pending trial, betrayed by evidence that he created and that was seized from his own home, did Defendant's twenty-year pattern of sexual abuse come to an end.

Despite knowing what he did was wrong, Defendant continues to claim that he was "strong arm[ed] into pleading guilty" to *fifteen* counts of sex trafficking by fraud and coercion; Defendant says he's "not guilty." (Gov. Sent. Ex. 67, at 9:35-12:00, 13:10-20:07; *see, e.g.*, Final PSR 79-80, ¶¶ 345-51; Gov. Sent. Ex. 66). Instead of expressing remorse for the harm he has caused to victims, Defendant contends that the victims have been manipulated "by law enforcement." (ECF 53, at 9, ¶ 77). And rather than owning up to the evidence proving his guilt, Defendant criticizes investigators for doing a thorough investigation, stating that investigators mischaracterized the "facts" and went " "to[o] far" in analyzing his actions. (*See, e.g.*, ECF 55, at 5; ECF 53).

What Defendant fails to comprehend is that it is his own actions that demonstrate the scope and depravity of his conduct—his admissions, his text messages, his hidden cameras and child pornography, his fraudulent documents. (ECF 55, at 4). He is the one who has admitted that for nearly twenty years he lied and coerced victims to perform commercial sex acts. (ECF 41, at 18, ¶ 3(e), (f)). It was

Defendant's seven cellphones which contained "thousands of text messages [Defendant] sent" "to approximately 175 to 200 teenage boys and young men designed to defraud and coerce them to give [Defendant] access to their bodies and/or to engage in commercial sex acts." (Final PSR 13, 19, ¶¶ 55(a), 88). It was his ten computers which documented years of Defendant searching for and storing images and videos of children being sexually exploited, often by men in the same professions as himself. It was the same devices that housed images and videos of naked children that Defendant himself touched after telling them or their parents lies to allow such contact. (Final PSR 13, 18-19, 29-30, ¶¶ 55(a), 90, 134-36; Gov. Sent. Exs. 203, 207). The "several hidden cameras" found at his house were the tools Defendant used to capture 25-30 victims naked and/or engaged in sex acts. (Final PSR 13, 63, ¶¶ 55(c), 274-276). And it was Defendant's filing cabinets that contained hundreds of fraudulent "consent forms and contracts [Defendant used] to suggest to his victims that his conduct was legitimate." (Final PSR 11, 13, 20-22, 69-70, 77-78, ¶¶ 43, 55(b), 93-107, 283, 331-33, 339).

Defendant has been caught red-handed. It is his own conduct, not the conduct of investigators, that is the reason he is here, along with the evidence Defendant kept in his possession. Defendant's continued defiance and failure to accept responsibility for his actions exemplify just how dangerous he is. A life sentence is necessary to permanently stop Defendant from ever having the opportunity to victimize anyone ever again.

# CONCLUSION

The nature and circumstances of Defendant's offenses are egregious; his history is one of preying on teenage boys and young adults to fulfill his sexual desires. The government respectfully requests that this Court sentence Defendant to life in prison and grant the victims restitution as requested.

Respectfully submitted,

Richard D. Westphal
United States Attorney

By: _/s/ Kyle J. Essley_
Kyle J. Essley

_/s/ Amy L. Jennings_
Amy L. Jennings
Assistant United States Attorneys
Neal Smith Federal Building
210 Walnut Avenue, Suite 455
Des Moines, Iowa 50309
Tel: (515) 473-9300
Fax: (515) 473-9292
Email: Kyle.Essley@usdoj.gov
Email: Amy.Jennings2@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2025, I electronically filed the foregoing with the Clerk of Court using the CM ECF system. I hereby certify that a copy of this document was served on the parties or attorneys of record by:

|    | U.S. Mail | Fax | Hand Delivery |
|----|-----------|-----|---------------|
| X  | ECF/Electronic filing | | Other means |

UNITED STATES ATTORNEY

By: /s/ _Janna Colvin_
    Paralegal Specialist